25 So.2d 900

**SCHNEIDER v. SCHNEIDER.**

No. 38089.

March 18, 1946.

Rehearing Denied April 22, 1946.

Walter B. Hamlin, of New Orleans, and Sidney W. Provensal, of Slidell, for plaintiff and appellant.

J. Monroe Simmons, of Covington, and Richard A. Dowling, of New Orleans, for appellee.

FOURNET, Justice.

Mrs. Louise Manion Schneider is appealing from a judgment of the district court dismissing her suit against her husband, Claude W. Schneider, for separation from bed and board based on cruel treatment, outrages, and excesses toward her.

The specific allegations upon which the plaintiff based her action are that (1) "about six months after their marriage, her * * * husband cursed and abused her without any cause or provocation * * * to such an extent that she was compelled to leave him and return to the home of her parents, where she remained for about a week"; (2) "That, when their oldest child was about 13 months old, her * * * husband again cursed and abused her without cause or provocation, and she was again compelled to leave him, remaining away for about five days." On both of these occasions she alleges she only returned to her husband upon the entreaty of her family. She further alleged (3) that she lived with her husband from that time "with infrequent bursts of temper and violent abuses on his part, until the summer of 1937, when her * * * husband, without any provocation, called her a liar and assaulted and beat her; * * * threw her against the family automobile,"

injuring the back of her head and bruising her face; (4) that in February of 1944 he came into the room of one of their daughters at the family residence, where she was then staying, and insisted upon her returning to his room with him, saying "You'll have to do as I want you to do, or I'll choke you," and that upon her refusal he placed his hands on her throat in an attempt to choke her, since which time she has kept her door locked, and that at this time she was pregnant although unaware that she was; (5) that her husband continued to abuse and subject her to rough and violent treatment on many occasions, more particularly during August of 1944, when he violently grabbed a chair, saying, "I'll pick up this chair and kill you with it"; (6) that he abused her while she was pregnant by nagging, speaking to her in loud and harsh tones and in a cruel manner and at times cursing her, casting aspersions and insinuations upon her conduct in front of her children, particularly with reference to war work done by her at LaGarde hospital, with the result that she was continually taking bromides and calling her doctor in because of her nervous condition; (7) that he publicly defamed her by openly stating in the presence of their daughters that she is mentally unbalanced; and (8) finally, that because of these many abuses she has become very nervous and unhappy and is therefore entitled to a separation from bed and board. In a supplemental and amended petition she alleged that in the early part of the summer of 1944 her husband pushed her against a door, causing her to sustain a bruise, as a result of which she had a black eye.

In his answer the defendant admitted he and his wife quarreled on several occasions but denied that these quarrels were precipitated by any action on his part, attributing them to her extravagance and utter disregard for money or financial obligations and to her reference to his conduct with imaginary women. He also gave his version of the several incidents upon which his wife based her action.

The trial judge, in dismissing the plaintiff's suit, did not, as reflected by his written reasons for judgment, pass upon the several alleged acts of the husband upon which the plaintiff based her cause of action, being of the opinion that there was co-habitation as late as June 9, 1944, as contended by the husband, and that this amounted to a condonation of all of his faults that he had committed up until that time and that she had failed to establish the only charge against her husband that had taken place thereafter, that is, the incident of his threat to her life in August of 1944. He also expressed the opinion that most of the difficulties that had arisen between these parties had been financial in nature, stating: "The defendant is a business man in the town of Slidell and owns one-third of the stock of the Schneider Brick and Tile Company. He is a man of some means and the record shows that he was generous with his family. His wife, on the other hand, appears to have been a good wife and a good mother, but her extravagances led to embarrassment to him

on many occasions. * * * I am satisfied that there is disappointment in this marriage * * * and I am further satisfied that there is an incompatibility of temper, but these are not causes for separation from bed and board under our laws."

The plaintiff and defendant, members of prominent families, were, according to the record, married in New Orleans on October 22, 1924, and thereafter made their home in Slidell, Louisiana, where the defendant's business is located. Of this union three children were born, Ellen, Margaret, and Charles John, who were 18 years, 15 years, and 9 months respectively at the time this suit was instituted. Subsequently, in 1938, they moved to New Orleans, where the defendant had purchased a large home in a fashionable section of the city so that their daughters might enjoy the broader cultural, educational, and social advantages afforded in the city, they being placed in fashionable schools. (The elder was in a college in the East at the time this suit was instituted.) It appears that the defendant is a man of some means; that he provided well for his family and that, in so far as the record in this case shows, until the plaintiff first began her action for a separation, which came as a shock to their friends who had always regarded them as a congenial and happily married couple, the friends and acquaintances in their social circle were unaware of any difficulties between them.

■ From our appreciation of the evidence, which we have studied very carefully, we conclude, as did the trial judge, that most of the difficulties that arose between these parties apparently came about as the result of arguments over money matters and we think these difficulties have culminated in the present incompatibility of these parties. But we disagree with the trial judge's conclusion that the defendant has borne the burden of proof that was upon him to support his special plea of condonation, based on his alleged cohabitation with his wife on June 9, 1944. To support this he relied on his uncorroborated testimony, which is flatly denied by his wife, and, in our opinion, there is nothing in the record that would justify our giving more weight to his testimony in this respect than to hers. He has thus failed to establish this plea by the preponderance of the evidence required by law.

■ On the other hand, we think the plaintiff has also failed to establish the allegations upon which she based her action by a preponderance of the evidence. With the exception of her mother's testimony and that of Miss Jennie Peters, the plaintiff relied entirely upon her own testimony and this shows that most of the incidents of which she complains in her petition were precipitated by her, as contended by her husband, and in the other material but controverted aspects she was not corroborated.

The testimony of the plaintiff's mother adds very little to hers, since it does no more than corroborate the plaintiff's testimony that she did return to her family home on the two times she alleges she did. The gist of the remainder of Mrs. Manion's testimony is that the plaintiff and defendant were constantly wrangling. She ad-

mitted on cross-examination that the defendant had provided well for his family and that the source of most of their arguments was money.

The same may be said of the testimony of Miss Jennie Peters, as will be shown when that part of the plaintiff's testimony sought to be corroborated by her, i. e., the threat to the plaintiff's life in August of 1944, is referred to.

The plaintiff's testimony with respect to the incident that allegedly occurred 6 months after their marriage is, to say the least, rather meager and indefinite, her intimation being that her husband's jealousy, because of the presence of a guest in their home, whom she did not name, caused him to call her a liar and to use ugly language (though she does not say just what that language was), with the result that she was forced to leave him and return to her family home. When she was questioned on cross-examination about what had caused this argument, she said that it had begun over jealousy and "resulted in money."

According to the plaintiff's testimony she was forced to leave her husband again because he cursed and abused her (though again she does not specify the language used or the manner in which she was abused) as the result of an argument over unpaid Christmas bills amounting to $750. She admitted on cross-examination that she resented her husband speaking to her about these bills and became very angry because when she had asked him how much to spend for Christmas he had told her to get what

she needed without specifying the amount he wanted her to spend.

The defendant testified that both of these arguments began over money matters but he stated that while he did not remember the exact words that were used by him on these occasions, such a long time having elapsed, and that although he might have used the usual harsh words a man will use in a family argument, he was sure he had not cursed her for he was not in the habit of cursing his wife. He stated that from his recollection of the first incident the argument arose when he found that his wife had allowed a number of unpaid bills to accumulate in a dresser drawer despite the fact that he had provided her with an ample allowance with which to take care of them and in explaining the second incident he said that he had always enjoyed a reputation for paying his bills promptly and that he had always tried to maintain this good credit standing and so had "tried to impress on her that I demanded she pay her bills and I gave her ample money to do so, and told her that in the event it was not enough to come to me and get some more. She would frequently let bills run until they would write that they were past due."

Certainly neither of these incidents, taking the wife's own version of them, would be grounds for separation from bed and board.

In support of the third alleged incident relied on by the plaintiff, i. e., that he called her a liar, assaulted and beat her, and threw her against the family automobile, injuring her head and bruising her face in the summer of 1937, she testified

that this incident resulted from an argument over a wedding and reception that was to take place at eleven in the morning and to which the defendant refused to take her, asserting he didn't care for her to associate with that class of people, but which he attended himself, only to return long after lunch (about 3:30 in the afternoon); that the argument culminated in his use of abusive language (again no designation being made of just what this consisted) and that when she endeavored to leave to return to her mother's home her husband tried to prevent her leaving in the car, grabbing her and throwing her against the automobile, causing an injury to her head and a bruise to her face. Under cross-examination she admitted that she frequently threatened to leave home when she and her husband had arguments and when asked the question: "You started the argument about why he was late coming in. You were pretty angry and really 'balled him out,' didn't you?" she replied: "Maybe I did."

Her husband's testimony with respect to this incident is that he was merely endeavoring to prevent her from leaving in the car because of her hysterical condition and that in her determination to get into the car anyway she jerked away and hit her head against the door. She corroborated this testimony on cross-examination by admitting that her husband held her to keep her from getting into the car.

With respect to the incident of February in 1944, when the defendant is alleged to have threatened to choke her, she stated in effect that her husband came to her

room to compel her to return to the room they had always shared together and that he was in a terrible humor and when she refused to comply he said: "You'll have to do as I want you to do, or I'll choke you," putting his hands about her throat. She assigned as her reason for moving from her husband's room the continued and protracted arguments they had been engaging in ever since his return from a trip to Hot Springs in October or November previously over her demand that he give an accounting for the amount of money spent by him while there, stating in answer to the query of the trial judge as to the cause of these arguments that it was "Money again."

The defendant admitted going into his daughter's room on this occasion but said it was for the purpose of ascertaining why his wife refused to share his bed with him and to entreat her to return, and he stated that while he sat on the side of the bed pleading with her to return he did place his hands on her shoulder asking her what in the world she meant when she said she wouldn't live with him any more because he hadn't been a decent father to the children.

It appears to us, as it did to the trial judge, that the plaintiff failed to give any good or logical reason for leaving her husband's room for on cross-examination she admitted she continued to live with him as man and wife during the time she claimed these arguments were in progress and under further cross-examination she admitted that she did not quit sleeping with her husband because of the Hot Springs trip. Be-

sides we do not think the evidence shows that the plaintiff was choked or otherwise abused on this occasion.

The next incident in order of time, although pleaded by the plaintiff in her supplemental and amended petition, is alleged to have occurred in the early part of the summer of 1944, when the defendant is said to have pushed the plaintiff against a door, giving her a black eye. The plaintiff's version of this incident, as given in her testimony, is as follows: "He asked me to come into the big bedroom where he was and wanted to make up with me and wanted to force himself on me, and threw me across the bed that particular night. I told him I was finished with him. He handled me very roughly and after about an hour or so he left. * * * He pushed the door in my face and I had a bruise." Under cross-examination, however, she admitted she closed the door behind her husband, who had just reluctantly left the room, and that she was struck when he attempted to reopen the door to discuss the matter further with her.

From the foregoing it may be readily seen that the actions of the defendant were not such as would warrant a separation under our law, particularly when the defendant denied the incident occurred as testified to by his wife, although admitting having gone into the room to beg her to live with him again, stating that she not only did not receive a black-eye on this occasion but that he had never known her to have one.

We now come to the final incident alleged in detail in the plaintiff's petition, i.

e., that her husband threatened to kill her with a chair in August of 1944.

According to the plaintiff's version of this incident, it happened on a Saturday night about 7:00 or 7:30 when the defendant returned home in an intoxicated condition and demanded his dinner, which she refused to give him, informing him that the plant closed on Saturday at 12:00 and that she knew where he had been, stating "you have been down in French Quarters again." She testified that he thereupon began to curse her (again failing to detail the words used) and in the presence of Jennie Peters, an elderly lady who had fixed his dinner, said he was tired of the plaintiff accusing him of things of that sort and stated: "If you don't let me alone, I will pick up this chair and kill you."

The defendant denied that he cursed his wife or made the threat attributed to him on this occasion, explaining that he had gotten back late that night because he had stopped at the Rigolets to arrange for a fishing trip for the plaintiff's younger brother, who had just returned from the Pacific, when he was met with his wife's accusations, and that he was leaning on a chair at the time and merely shoved it under the table, saying, "For God's sake, let me get out of here."

Thus it may be seen from the plaintiff's own testimony that this incident was brought about by her own actions, and, furthermore, that it does not support the allegation in the petition that the defendant threatened to kill her with a chair.

Little weight can be added to her testimony by that of Jennie Peters for al-

though Jennie Peters stated she heard the defendant say: "I'll kill you" (which is obviously at variance with the plaintiff's testimony), she said she was not in the kitchen at the time but in the library and only went to the kitchen when she heard a loud argument, reaching there just in time to hear these words and leaving at once to go back to the library. She could not have thought the plaintiff was in any imminent danger for she admitted that although she was very attached to the plaintiff, having known her since her birth, she did nothing to help her or to secure outside assistance. Besides the weakness of this testimony is further evidenced by the fact that Jennie Peters first denied having seen the defendant again on that night but later, under pressure of cross-examination, admitted that he had driven her home that evening, as well as by the fact that she first denied telling the defendant to be patient with his wife because her irritability was due to her condition and that everything would be all right after the child was born and later admitted that she did make such a statement to him on this occasion.

In so far as the allegations contained in the sixth and seventh paragraphs of the plaintiff's petition are concerned, i. e., the general allegation that her husband constantly nagged her and abused her during her pregnancy, causing her to call the doctor and to take bromides for her nervous condition, and her public defamation in front of her children, as well as the general allegation in her supplemental and amended petition "that he has laid his hands on her violently on other occasions

during 1944 while abusing her, the exact dates of which petitioner does not now recall," the proof is totally lacking in some instances and in others it is very meager and indefinite, consisting only of her testimony in generalities that these things occurred.

The defendant denied ever abusing his wife, as claimed by her, or that he had ever defamed her, stating he merely told his children their mother wasn't well. He also stated he had cast no aspersions on her war work but had merely stated he did not want her to allow it to interfere with her management of her home, where she had as many as three regular servants employed, in addition to a yard man and other occasional outside help.

The plaintiff's physician, called as a witness by the defendant, testified, over plaintiff's objection, that while she was apparently nervous during her pregnancy and had complained to him about her husband's treatment, he knew her well, having treated her for a number of years, even prior to her marriage, and knowing her to be of the nervous type had paid little attention to just what her specific complaints were and did not, in fact, note them. Obviously he did not consider her nervous condition to be out of the ordinary, for he testified she had a normal pregnancy and that he did not treat her for nervousness during all of that time.

For the reasons assigned, the judgment appealed from is affirmed.

KENNON, J., takes no part.